UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

CAROLYN PHILLIPS,

               Plaintiff,             **JURY TRIAL DEMANDED**

   -against-                        **COMPLAINT**

DOW JONES & COMPANY,             **04 Civ 5178 (DAB)(AJP)**

               Defendant.

---------------------------------------X

     Plaintiff, CAROLYN PHILLIPS, by her attorneys, McLAUGHLIN &
STERN, LLP, as and for her COMPLAINT, upon information and
belief, alleges the following:

## INTRODUCTION

_____This is a civil action for damages and equitable relief
instituted pursuant to the provisions of 42 U.S.C. Section 2000e
*et seq.* of the Civil Rights Act of 1964, as amended ("Title
VII"), 42 U.S.C. Section 1981 of the Civil Rights Act of 1866, as
amended ("Section 1981"), the American with Disabilities Act, 42
U.S.C. 12112 *et seq.* (the "ADA"), the New York State Executive
Law, Section 290 *et seq.* (the "New York State Human Rights Law"),
and the New York City Administrative Code Section 8-107 *et seq.*
(the "New York City Human Rights Law").

     Plaintiff CAROLYN PHILLIPS ("Plaintiff" or "PHILLIPS")
brings this action to redress discrimination against her in the
terms and conditions of her employment on the basis of her race

in that PHILLIPS was terminated by her employer DOW JONES &
COMPANY ("DOW JONES"), from her position as Assistant Managing
Editor of the *Wall Street Journal* on November 11, 2002, based on
her race which is African-American.  DOW JONES discriminates in
the terms and conditions of employment of its African-American
employees, and in particular at the upper levels of management.
Of the approximately nine independent bureaus, none is headed by
an African-American and there are no African-Americans at the
level of Assistant Managing Editor or above, and DOW JONES has a
pattern and practice of channeling its African-American senior
staff to minority functions.  This discrimination is part and
parcel of a larger pattern and practice of discrimination in the
terms and conditions of employment between its Caucasian and
African-American employees, in terms of job retention and
commitment.  DOW JONES' conduct towards and termination of
PHILLIPS was part of this pattern of discrimination.

DOW JONES also discriminated against PHILLIPS based on a
medical condition which required her to take a medical leave and
its perception when she returned that she was unable to perform
her duties.  When plaintiff was required to take her medical
leave, DOW JONES reassigned her duties and refused to assign her
new duties when she returned.  In addition, DOW JONES' conduct
towards and termination of PHILLIPS in this respect did not
accord with its treatment of Caucasian employees who took medical

leave and were permitted to return to their former assignments, and DOW JONES then used the fact that plaintiff had no formal job duties to justify its decision to terminate her employment.

### JURISDICTION AND VENUE

1.   This Court has jurisdiction of the action pursuant to 42 U.S.C. 2000e-5(f)(3) and 12117(a), and 28 U.S.C. 1343(3) and the principles of ancillary jurisdiction.  In addition, all conditions precedent to jurisdiction under Title VII have been complied with, in that a charge of employment discrimination was filed with the Equal Employment Opportunity Commission (the "EEOC" or the "Commission") within 300 days of the unfair employment practice and the plaintiff received notification from the Commission, dated June 3, 2004, of her right to sue within 90 days of receipt.  A copy of this Complaint is also being filed with the Corporation Counsel of the City of New York and the New York City Commission on Human Rights pursuant to the New York City Administrative Code.

2.   Venue properly lies in this judicial district pursuant to 28 U.S.C. Section 1391(b) and (c) and 42 U.S.C. Section 2000e-5(3) and 12117(a), in that defendant DOW JONES maintains an office within this judicial district, and a substantial part of the events constituting the discrimination have taken place within this judicial district.

3

## PARTIES

3.  At all relevant times, plaintiff CAROLYN PHILLIPS was a citizen and resident of the State of New York, residing in the City of New York.  Plaintiff currently resides in Albemarle County, Virginia.

4.  At the time of her termination, PHILLIPS had been at the *Wall Street Journal* for more than twenty years and was Assistant Managing Editor of *The Wall Street Journal*.  PHILLIPS is an African-American woman, and is the first and only African-American to be appointed as an Assistant Managing Editor and was the highest ranking African-American at *The Wall Street Journal*.

5.  PHILLIPS also suffers from lupus, a chronic disease of the immune system, and developed uveitis, a serious eye disease, secondary to the lupus which temporarily affected plaintiff's vision.

6.  Upon information and belief, defendant DOW JONES is a Delaware Corporation.  Defendant DOW JONES is engaged in the publication of business and financial news and has affiliated offices around the United States and throughout the world, and employs more than seven thousand people worldwide.  Its headquarters and principal place of business is located at 200 Liberty Street, New York, NY 10281.

7.  DOW JONES is the publisher of the *Wall Street Journal* (the "*Journal*").

### FACTS COMMON TO ALL COUNTS

8.  PHILLIPS began her employment at DOW JONES in 1982 as a reporter in the *Journal*'s Chicago Bureau.  PHILLIPS was the only African-American reporter in the Chicago Bureau and had replaced an African-American reporter who had left the *Journal*.

9.  Upon information and belief, at the time of her hire, DOW JONES was under pressure by the American Society of Newspapers Editors ("ASNE") to increase minority representation at newspapers and DOW JONES hired PHILLIPS on a separate EEO budget.

10.  Notwithstanding DOW JONES creation of an EEO budget to hire minorities, and, in particular African-Americans, throughout plaintiff's tenure fewer than ten percent of the *Journal*'s total staff was and is African-American, and fewer than five percent were or are in management positions in news.  Upon information and belief since plaintiff's termination, there are no African-Americans at the upper levels of management at the *Journal*.

11.  Although PHILLIPS received successive promotions within the Chicago Bureau, in 1986, she was passed over for promotion to the position of News Editor in favor of a less qualified Caucasian male and was instead transferred to a minority slot  at

its headquarters in New York to address minority recruiting. The appointment was for a one year term and, upon information and belief, had always been filled by an African-American.  In addition, in or about 1987, DOW JONES had hired another African-American as a senior editor for "urban affairs" and for minority recruiting.  These appointments were part of a pattern and practice of channeling African-Americans to minority functions.

12.   In 1987, following the completion of plaintiff's one-year term in minority recruitment, plaintiff transferred to the Houston Bureau as Deputy Bureau Chief.

13.   Plaintiff was the first African-American to serve as Deputy Bureau Chief at the *Journal*.

14.   Notwithstanding that plaintiff received excellent performance evaluations and was qualified for promotion to Bureau Chief, in or about 1989, DOW JONES passed over Phillips for promotion to Bureau Chief and appointed a white male to the position.

15.   Thereafter, in or about 1991, when the Houston Bureau Chief position became vacant again, DOW JONES only appointed plaintiff as Bureau Chief after plaintiff protested its failure to consider her for the position.

16.   Upon information and belief, DOW JONES failed to consider her for the position because she was African-American.

6

17.  PHILLIPS was the first African-American to serve as Bureau Chief of any of the *Journal*'s bureaus and upon information and belief there was substantial opposition to her appointment as Bureau Chief based on her race.

18.  Between 1991 and 1994, PHILLIPS' performance as Bureau Chief in Houston was excellent.

19.  Notwithstanding plaintiff's excellent performance, upon information and belief, there was continued opposition by various Caucasian members of upper management at the *Journal* to an African-American as Bureau Chief.

20.  Thereafter, DOW JONES took certain actions which undermined plaintiff as Bureau Chief and had a negative impact on the performance of the Houston Bureau, in that DOW JONES transferred the Deputy Bureau Chief without consultation with plaintiff and without giving plaintiff notice so that she could replace the Deputy, all of which was contrary to DOW JONES' protocol for the transfer of staff, and DOW JONES also refused to provide necessary funding for the Bureau.

21.  Thereafter, in 1995, DOW JONES appointed PHILLIPS to the Managing Editor's Office as one of four Assistant Managing Editors.

22.  At the time of DOW JONES' appointment of plaintiff, she was told that she would replace the Assistant Managing Editor in charge of Staffing and Training who had left the *Journal*.

23.   Prior to PHILLIPS' appointment, the position had been held by a white male, and PHILLIPS was the first and only African-American appointed as an Assistant Managing Editor.

24.   Between plaintiff's appointment in 1995 and 2002, DOW JONES took successive actions, because of her race, which both diluted and undermined plaintiff's role as an Assistant Managing Editor in that:

(A)   Between the time of plaintiff's appointment and the time she actually started as Assistant Managing Editor, DOW JONES changed the organizational structure of the Managing Editor's Office.

(B)   At the time of her appointment, the organization of the Managing Editor's Office consisted of the Managing Editor, one Deputy Managing Editor and four Assistant Managing Editors.

(C)   The structure of the Managing Editor's Office had been such that her predecessor and the Assistant Managing Editor for Budgets met and worked together on a regular basis with the Managing Editor and the Deputy Managing Editor, and the four constituted a *de facto* team which headed the *Journal*.

(D)   In the interim, DOW JONES had created a second Deputy Managing Editor position and appointed a Caucasian male to the position.

(E)   The new Deputy Managing Editor took over her staffing function, notwithstanding that he had lesser experience

8

and qualifications than plaintiff in staffing and recruiting, and plaintiff was relegated to the function of minority staffing.

    (F)   The Deputy Managing Editor also took over plaintiff's office and secretary.

    (G)   DOW JONES excluded PHILLIPS from important meetings with the Managing Editor and/or Deputy Managing Editor which her white male predecessor had regularly attended.

    (H) DOW JONES excluded PHILLIPS from important staffing decisions, including minority staffing, and in many instances, PHILLIPS only learned of staffing decisions after the fact.

    (I)   DOW JONES also excluded plaintiff from other strategic roles and set up training for staff without consulting or including plaintiff.

    (J)   DOW JONES also excluded plaintiff from important meetings concerning retention.

    (K)   In or about 1999 DOW JONES promoted another white male to the position of Assistant Managing Editor with no defined responsibilities.  Thereafter, DOW JONES by-passed plaintiff who had responsibility for facilities and assigned a major facilities project to the white male.

    (L)   DOW JONES then further diminished plaintiff's Assistant Managing Editor position, by successively increasing the number of Deputy Managing Editors and creating three more Deputy positions above plaintiff in Spring 2000, Fall 2000 and

9

Summer 2002.  In connection with the increase in the number of Deputy positions, DOW JONES further undermined plaintiff's position, in that it promoted a Caucasian Assistant Managing Editor, who had held the position for less than a year and subsequently promoted two additional Caucasians who had never held an Assistant Managing Editor position.

(M) In addition, in connection with each of these promotions, PHILLIPS was repeatedly required to relocate her office, and, in fact, was required to move her office five times. Upon information and belief, no other Assistant Managing Editor was required to relocate in this manner.

25.  DOW JONES' marginalization of plaintiff's position was also consistent with its treatment of the two other high ranking African-Americans, in that a senior editor in the Managing Editors' office had been channeled into functions addressing African-American affairs and an African-American who was one of the Bureau Chiefs in New York was often by-passed and not consulted in the performance of her job.

26.  Upon information and belief, DOW JONES also discriminated against plaintiff, in that it paid plaintiff less than other Assistant Managing Editors who were Caucasian.

27.  Notwithstanding, DOW JONES' treatment and marginalization of plaintiff's position, plaintiff continued to perform and received outstanding evaluations.

10

28.   Because of DOW JONES' increasing marginalization of plaintiff's position and relegation to minority recruiting, plaintiff, thereafter, sought out other positions at the *Journal*, including in late 2000, plaintiff applied for the position of Health Editor. Although PHILLIPS was qualified for the position of Health Editor, DOW JONES rejected plaintiff's application and gave the position to a white male with lesser qualifications for the Editor's position.

29.   At or about the same time, plaintiff also proposed other projects for which she was qualified.  DOW JONES ignored plaintiff's proposals.

30.   Thereafter, in late December 2000, PHILLIPS developed uveitis, a serious eye disease.  As a result of the uveitis, PHILLIPS' vision was affected and she was unable to use her eyes for approximately two months.

31.   PHILLIPS' doctor instructed her that she should stay at home for a period of time in order to treat the illness and permit her recovery, and informed the Managing Editor.

32.   DOW JONES' disability provisions provide for six months paid short term disability and plaintiff began her medical leave in January 2001.

33.   Despite her impairment, plaintiff performed some of her functions from home.

11

34.  Although PHILLIPS fully expected to recover and return to work, within two months of her illness DOW JONES had reassigned her responsibilities to two Caucasian Assistant Managing Editors, one of whom also took over plaintiff's office.

35.  Upon information and belief, both of the Caucasians had recently been promoted as Assistant Managing Editors and had no defined responsibilities.

36.  DOW JONES' assignment of plaintiff's responsibilities was different than its treatment of Caucasian employees who developed serious or long term illnesses, whose positions were held open for them.

37.  In March 2001, the Managing Editor met with plaintiff and informed plaintiff of the reassignment of her recruiting and training functions, but assured her that he would find another position for her when she returned to work.  The Managing Editor also suggested that plaintiff take all the time she needed before she returned to work.

38.  At the time the Managing Editor met with plaintiff she had already regained her sight and was able to read.

39.  In or about the beginning of June 2001, PHILLIPS informed the Managing Editor that she would return to work the following month.

40.   PHILLIPS thereafter returned to work at the beginning of July 2001 on a full-time basis and was fully able to perform the essential functions of an Assistant Managing Editor position.

41.   Notwithstanding that plaintiff had regained her sight and was able to work, DOW JONES' regarded plaintiff as having a physical impairment that substantially limited her major life activities of working and seeing.

42.   Upon her return from her medical leave, DOW JONES continued to discriminate against her, based on her race, and to treat her differently than it treated its Caucasian senior staff, in that DOW JONES practice was to make positions available for senior staff.   Notwithstanding that two Assistant Managing Editors retired while plaintiff was on medical leave, in one case DOW JONES distributed his functions among its Caucasian staff, even though the functions were functions which plaintiff had performed prior to her medical leave and did not reassign them to her.   In the other case, DOW JONES transferred a Caucasian from another DOW JONES' department to take over the functions, notwithstanding that the Caucasian had no greater experience than plaintiff.

43.   Upon information and belief, DOW JONES transferred the Caucasian to take over the duties of the Assistant Managing Editor because it had assigned someone else to take over his duties and DOW JONES wanted to find a position for him.

13

44.   Although the Managing Editor had promised to find plaintiff a new position when she returned, the Managing Editor had taken no steps to find her a new position and did not undertake to find her a new position as he had for Caucasians.

45.   Thereafter, the Managing Editor also discriminated against her and refused to consider plaintiff for certain positions, which plaintiff was qualified for and able to perform, based on his perception that she would not be able to do the work because of her medical condition and vision loss, and made comments to this effect.

46.   Following the events of September 11, 2001, which displaced the *Journal*'s New York office, PHILLIPS and other *Journal* managers worked at home.  Although many employees were commuting to the *Journal* facilities in New Jersey, the Managing Editor discouraged plaintiff from the commute to New Jersey because of her perceived disability, notwithstanding that plaintiff had informed him, by December 2001, she would be able to make the commute or to otherwise work out of New Jersey with no damage to her health.

47.   In March 2002, the Managing Editor and others had started working out of a temporary location on Canal Street, but did not inform plaintiff of this.  When PHILLIPS did learn this, she reported for work every day, but still did not have any permanent assignment.

14

48.   During this period, positions which plaintiff was qualified for became available, including the position for Health Editor, which had become vacant again.   Plaintiff only learned that this position had become available after DOW JONES had assigned it to an Asian with lesser qualifications than plaintiff, but DOW JONES did not consider and/or offer plaintiff this position.

49.   DOW JONES' treatment of plaintiff was part and parcel of a larger discriminatory pattern towards African-Americans at the *Journal* and the *Journal* does not have the same commitment to the retention of qualified African-Americans as it does for its Caucasian staff.

50.   In 2002 DOW JONES also appointed another Caucasian Deputy Managing Editor to the Managing Editor's office.   Upon information and belief, DOW JONES' appointment of him was made in order to accommodate his request for a new position.

51.   DOW JONES' conduct in its failure to find plaintiff a permanent position was also different from its conduct with respect to Caucasian employees who became sick, including with long term or otherwise debilitating illnesses, who were either returned to their former positions or to other positions.

52.   DOW JONES' treatment of plaintiff was consistent with its treatment of another African-American employee who became sick and had to take medical leave.   In the case of the other

African-American, an Assistant Managing Editor told her "not to rush back", and reassigned her job, although she was only out for a brief period.

53.  In or about mid-October 2002, DOW JONES announced impending layoffs.  Although DOW JONES stated that the layoff was for financial reasons, in connection with the layoff, DOW JONES announced that it would help staff who were laid off find other positions at the *Journal*.

54.  On November 11, 2002 the Managing Editor informed plaintiff that she was being laid off, and that her employment would terminate effective December 31, 2002.  Upon information and belief, Caucasian editorial staff employees, who were laid off at the same time as PHILLIPS were informed at the time of their layoffs that they would be rehired.

55.  PHILLIPS was the first and only African-American to reach the Assistant Managing Editor level, and, upon information and belief, PHILLIPS was the first and only Assistant Managing Editor who had or has ever been laid off at the *Journal*.  Upon information and belief, since PHILLIPS' termination there have been no African-Americans in the Managing Editor's Office at the *Journal*.

56.  DOW JONES' termination of plaintiff was discriminatory in that plaintiff was told it was because she had no defined responsibilities, notwithstanding that DOW JONES routinely

16

transferred Caucasians to the Managing Editor's Office with no defined responsibilities.

57. DOW JONES' termination of plaintiff was further discriminatory in that it was also motivated by DOW JONES' perception that she was disabled, in that DOW JONES refused to appoint plaintiff to any defined responsibilities subsequent to her return from medical leave and made comments about her medical condition. DOW JONES also told her that it would pay her a special amount which it computed to be the cost of medical coverage for her up until normal retirement. Upon information and belief, no other person terminated at the time of the layoff was offered a payment for medical coverage. The amount was also significantly less than what plaintiff would have been entitled to under DOW JONES' long term disability policy.

58. Upon information and belief, DOW JONES also informed the journalistic community both inside and outside the *Journal* that plaintiff was not well.

59. In addition, subsequent to plaintiff's "layoff", several positions became available at the *Journal* and, upon information and belief, virtually all of the Caucasian senior staff who were laid off were rehired in other positions. Although PHILLIPS was qualified for these positions and requested consideration for these or other positions, subsequent to her termination, DOW JONES refused to consider her requests.

## <u>AS AND FOR A FIRST CLAIM OF RELIEF</u>
(Under Title VII)

60.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "59", as if set forth in full herein.

61.  DOW JONES' decision to terminate plaintiff from her position as Assistant Managing Editor was based on plaintiff's race and was in violation of plaintiff's federally protected rights under Title VII, in that plaintiff was the only African-American at the level of Assistant Managing Editor and DOW JONES had never terminated a Caucasian at that level. Although DOW JONES purported to terminate plaintiff as part of the layoff, her termination was part of the pattern of discrimination against African-Americans and in connection with the layoff, upon information and belief, DOW JONES also rehired all of the senior Caucasian staff who had been laid off.

62.  DOW JONES' conduct was intentional, malicious and in reckless disregard of plaintiff's protected rights under the federal civil rights laws.

63.  As a result of DOW JONES' discrimination against plaintiff, she has lost her employment and has suffered severe economic and other injury.

64.  By reason of the foregoing, defendant has violated Title VII of the Civil Rights Act and plaintiff is entitled to the following relief:

18

(a)   economic damages in the amount of not less than Two Million ($2,000,000.) Dollars;

(b)   compensatory and punitive damages in the amount permitted by statute; and

(c)   attorneys' and expert fees in an amount not presently capable of ascertainment.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Under Section 1981)

65.   Plaintiff repeats and realleges each and every allegation set forth in paragraph "1" through "59" and "61" through "64" as if set forth in full herein.

66.   When plaintiff accepted employment with DOW JONES, plaintiff entered into a contract with DOW JONES whereby she was entitled to the same terms and conditions of employment and benefits and privileges of her contract with DOW JONES as Caucasians.

67.   When plaintiff was asked to be Assistant Managing Editor of the *Journal* for DOW JONES, defendant entered into a contract with plaintiff that plaintiff would be offered the same terms and conditions of employment as Caucasians.

68.   When DOW JONES changed the organizational structure and otherwise diluted plaintiff's position, DOW JONES changed the terms and conditions of its contract with plaintiff.

69.   When DOW JONES transferred plaintiff's functions for training and staffing to the Deputy Managing Editor and relegated

19

plaintiff to minority staffing, DOW JONES interfered with its contract with plaintiff and otherwise denied plaintiff the benefits and privileges of her contract with DOW JONES.

70.  When DOW JONES refused to consider plaintiff for other positions and/or responsibilities at the *Journal*, its refusal was based on plaintiff's race and denied plaintiff the benefits and privileges of her contract with DOW JONES.

71.  DOW JONES' decision to terminate plaintiff was on the basis of plaintiff's race and interfered with its contract with plaintiff and otherwise denied plaintiff the benefits and privileges of her contract with DOW JONES.

72.  Defendant's denial of the benefits and privileges of its contract with plaintiff and its interference with its contract with plaintiff to serve as Assistant Managing Editor of the *Journal* was intentional, malicious and otherwise in violation of Section 1981 of the Civil Rights Act of 1866.

73.  As a result of defendant's interference with its contract with plaintiff and denial to plaintiff of the benefits and privileges of her contract with DOW JONES, plaintiff has sustained severe economic loss and suffered from stress and other injury.

74.  By reason of the foregoing defendant has violated Section 1981 of the Civil Rights Act of 1866 and plaintiff is entitled to the following:

(a)   economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)   compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(c)   punitive damages in the amount of not less than Five Million ($5,000,000.00) Dollars; and

(d)   attorneys' and expert fees in an amount not presently capable of ascertainment.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Under the ADA)

75.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "59", "61" through "64" and "66" through "74", as if set forth in full herein.

76.  When plaintiff returned from medical leave she was able to perform the essential functions of an Assistant Managing Editor position.

77.  DOW JONES regarded plaintiff as suffering from a physical impairment which it believed permanently affected plaintiff's vision, despite the fact that plaintiff's vision loss was temporary and she had regained her vision prior to her return to work.

78.  DOW JONES regarded plaintiff's purported physical impairment as substantially limiting the major life activities of seeing and working.

21

79.   DOW JONES' refusal to reassign her duties or to assign her other duties when she returned from medical leave was based on its perception that she was unable to perform and was in violation of the provisions of the ADA.

80.   When DOW JONES terminated plaintiff it did so based, at least in part, on its perception that she was disabled and unable to perform.

81.   DOW JONES' termination of plaintiff based on its perception that she was disabled was in willful violation of plaintiff's protected rights under the federal labor laws.

82.   As a result of DOW JONES' discrimination against plaintiff, plaintiff has lost her employment and has suffered severe economic and other injury.

83.   By reason of the foregoing defendant has violated the provisions of the ADA and plaintiff is entitled to the following relief:

(a)   economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)   compensatory and punitive damages in the amount permitted by statute; and

(c)   attorneys' and expert fees in an amount not presently capable of ascertainment.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Under the New York State Human Rights Law)

84. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "59", "61" through "64", "66" through "74", and "76" through "83" as if set forth in full herein.

85. DOW JONES' refusal to either reassign plaintiff's former duties and responsibilities to her, or to assign other duties to her or to appoint her to another position when plaintiff returned from her medical leave was based on her race and was otherwise contrary to its treatment of senior Caucasian staff.

86. DOW JONES' termination of plaintiff at the time of the layoff was based on plaintiff's race and was otherwise contrary to DOW JONES' treatment of senior Caucasian staff for whom DOW JONES found other positions.

87. DOW JONES refusal to rehire plaintiff at the time of the layoff was based on plaintiff's race and was contrary to DOW JONES' treatment of senior Caucasian staff who DOW JONES' rehired subsequent to the layoff.

88. DOW JONES' refusal to either reassign plaintiff's former duties and responsibilities to her, or to assign other duties to her, or to appoint her to another position when plaintiff returned from her medical leave was based on

23

plaintiff's medical condition and/or because DOW JONES regarded plaintiff as disabled.

89.   DOW JONES' termination of plaintiff at the time of the layoff and its refusal to rehire her subsequent to the layoff was based on plaintiff's medical condition and/or because DOW JONES' regarded her as disabled.

90.   DOW JONES' conduct was all in violation of plaintiff's protected rights under the New York State Human Rights laws.

91.   As a result of DOW JONES' discrimination against plaintiff, she lost her employment and has suffered severe economic loss and stress and other injury.

92.   By reason of the foregoing, defendant has violated the New York State Human Rights laws and plaintiff is entitled to the following relief:

(a)   economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars; and

(b)   compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Under the New York City Human Rights Law)

93.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "59", "61" through "64", "66" through "74", "76" through "83" and "85" through "92", as set forth in full herein.

24

94. DOW JONES' refusal to either reassign plaintiff's former duties and responsibilities to her, or to assign other duties to her, or to appoint her to another position when plaintiff returned from her medical leave was based on her race and was otherwise contrary to its treatment of senior Caucasian staff.

95. DOW JONES' termination of plaintiff at the time of the layoff was based on plaintiff's race and was otherwise contrary to DOW JONES' treatment of senior Caucasian staff for whom DOW JONES found other positions.

96. DOW JONES' refusal to rehire plaintiff at the time of the layoff was based on plaintiff's race and was contrary to DOW JONES' treatment of senior Caucasian staff who DOW JONES' rehired subsequent to the layoff.

97. DOW JONES' refusal to either reassign plaintiff's former duties and responsibilities to her, or to assign other duties to her, or to appoint her to another position when plaintiff returned from her medical leave was based plaintiff's medical condition and/or because DOW JONES regarded plaintiff as disabled.

98. DOW JONES' termination of plaintiff at the time of the layoff and its refusal to rehire her subsequent to the layoff was based on plaintiff's medical condition and/or because DOW JONES' regarded her as disabled.

99.  DOW JONES' conduct was all in violation of plaintiff's protected rights under the New York City Human Rights laws.

100.  DOW JONES' conduct was intentional, malicious and otherwise in reckless disregard of plaintiff's protected rights under the New York City Human Rights laws.

101.  As a result of DOW JONES' discrimination against plaintiff, plaintiff lost her employment and has suffered severe economic loss and stress and other injury.

102.  By reason of the foregoing plaintiff is entitled to the following:

(a)  economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)  compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(c)  punitive damages in the amount of Five Million ($5,000,000.00) Dollars; and

(d)  attorneys' and expert fees in an amount not presently capable of ascertainment.

WHEREFORE, plaintiff requests that this Court issue a judgment granting the following relief to plaintiff:

1.  Issuing a declaratory judgment finding as follows:

(a)  Defendant has violated the provisions of 42 U.S.C. Section 2000e, *et seq.;*

(b)   Defendant has violated the provisions of 42 U.S.C. Section 1981, *et seq.;*

(c)   Defendant has violated the provisions of 42 U.S.C. Section 12112 *et seq.;*

(d)   Defendant has violated the provisions of the New York Executive Law, Section 290 *et seq.;* and

(e)   Defendant has violated the provisions of the New York City Administrative Code Section 8-107 *et seq.*

_____2.   Awarding plaintiff damages as follows:

## ON THE FIRST COUNT

_____(a)   economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)   compensatory and punitive damages in the amount permitted by statute; and

(c)   attorneys' and expert fees in an amount not presently capable of ascertainment.

## ON THE SECOND COUNT

_____(a)   economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)   compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(c)   punitive damages in the amount of not less than Five Million ($5,000,000.00) Dollars; and

(d)  attorneys' and expert fees in an amount not presently capable of ascertainment.

### ON THE THIRD COUNT

_____(a)  economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)  compensatory and punitive damages in the amount permitted by statute; and

(c)  attorneys' and expert fees in an amount not presently capable of ascertainment.

### ON THE FOURTH COUNT

_____(a)  economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars; and

(b)  compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars.

### ON THE FIFTH COUNT

_____(a)  economic damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)  compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(c)  punitive damages in the amount of not less than Five Million ($5,000,000.00) Dollars; and

(d)  attorneys' and expert fees in an amount not presently capable of ascertainment.

28

3.    Granting such other and further relief as the Court may

deem just, proper and equitable.

Dated:    New York, New York
          June 30, 2004

                              McLAUGHLIN & STERN, LLP


                              By:_____
                                  Steven J. Hyman (SH #2097)
                                  Janet C. Neschis (JN #7098)
                                  Deanna R. Waldron (DW #2611)
                                  Attorneys for Plaintiff
                                  260 Madison Avenue
                                  New York, NY 10016
                                  (212) 448-1100

*H:\users\JNESCHIS\PHILLIPS\COMPLAINT.wpd 2.wpd*